U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUL 3 1 2013

CLERK, U.S. DISTRICT COURT
By_____
                    Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

R.C., by and through his           §
next friends, S.K. and D.H.,       §
                                   §
          Plaintiff,               §
                                   §
VS.                                §   NO. 4:12-CV-716-A
                                   §
KELLER INDEPENDENT SCHOOL          §
DISTRICT,                          §
                                   §
          Defendant.               §


MEMORANDUM OPINION
and
ORDER

Came on for consideration in the above-captioned action the

motion for judgment on the administrative record filed by

plaintiff, R.C., by and through his next friends, S.K. and D.H.

Defendant, Keller Independent School District, filed a response,

and plaintiff filed a reply.  Plaintiff challenges the decision

of the Special Education Hearing Officer ("SEHO") in the

underlying administrative due process proceedings that (1)

defendant provided plaintiff with a free appropriate public

education ("FAPE") under the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., and (2)

plaintiff is not entitled to reimbursement for private placements

or evaluations, nor any other kind of relief.  Having considered

the motion, the response, the reply, the voluminous

administrative record, and applicable legal authorities, the
court concludes that plaintiff's motion should be denied, that
the findings, decisions, and rulings of the SEHO should be
affirmed, and that all relief sought by the complaint by which
this action was instituted should be denied.

I.

IDEA Statutory Framework

As a local educational agency responsible for complying with
the IDEA as a condition of the State of Texas's receipt of
federal education funding, defendant must (1) provide each
disabled child within its jurisdictional boundaries with a FAPE
tailored to his unique needs, and (2) assure that such education
is offered, to the greatest extent possible, in the educational
"mainstream," side by side with non-disabled children, in the
"least restrictive environment" suitable for the disabled
student's needs.  20 U.S.C. §§ 1400(c), 1412(1), 1412(5); Teague
Indep. Sch. Dist. v. Todd L., 999 F.2d 127, 128-29 (5th Cir.
1993).  The FAPE to which a disabled student is entitled under
the IDEA must be tailored to his particular needs by means of an
individual educational program ("IEP"), a written statement of
the special education, related services, and accommodations the
school will provide, which is prepared at a meeting attended by a
qualified representative of the school district, a teacher, the

2

child's parents or guardians, and, when appropriate, the child himself.  20 U.S.C. § 1401(20).  In Texas, the persons charged with preparing an IEP are known collectively as an Admissions, Review, and Dismissal Committee ("ARDC").

The FAPE tailored by an ARDC and described in an IEP, however, need not be the best possible one, nor one that will maximize the child's educational potential; rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him "to benefit" from the instruction.  Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 188-89 (1982).  In other words, the IDEA guarantees only a "basic floor of opportunity" for every disabled child, consisting of "specialized instruction and related services which are individually designed to provide educational benefit."  Id. at 201.  Still, the educational benefit which the IDEA contemplates and to which an IEP must be geared cannot be "a mere modicum or de minimis;" rather, the IEP must be "likely to produce progress, not regression or trivial educational advancement."  Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 248.  In short, the educational benefit that an IEP is designed to achieve must be "meaningful."  Id.

3

The IDEA requires states to "establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." 20 U.S.C. § 1415(a). Such procedural safeguards include allowing parents to play a significant role in the development of an IEP, and written notice of plans to change--or refusal to change--an identification or placement. See Winkelman ex rel. Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 524 (2007); Klein Indep. Sch. Dist. v. Hovem, 690 F.3d 390 (5th Cir. 2012). The state is also required to provide parents with an opportunity to present complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE]." 20 U.S.C. § 1415(b)(1). Then, if the complaints cannot be resolved at that stage, the parents may proceed to an impartial due process hearing conducted by the state or local educational agency, and this hearing is generally limited substantively to whether the child received a FAPE. 20 U.S.C. §§ 1415(f)(1)(A), 1415(f)(3)(E)(i). After parents have exhausted these administrative procedures, if they are dissatisfied with the result, they may bring a civil action

4

in a federal district court, without regard to the amount in controversy.   20 U.S.C. § 1415(i)(2)(A).

## II.

### Plaintiff's Complaint

Plaintiff filed his complaint in this action on October 5, 2012, asking the court to find that the SEHO erred in her findings, decisions, and rulings; and seeking exemplary damages, attorney's fees, and reimbursement for past tuition and medical bills.

## III.

### Standard of Review

When a federal district court reviews a SEHO's decision in a due process hearing under the IDEA, the court must accord "due weight" to the SEHO's findings, but must ultimately reach an independent decision based on the preponderance of the evidence. Bd. of Educ. Of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982); Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 252 (5th Cir. 1997).   Accordingly, this court's review of the SEHO's decision is "virtually de novo." Id.   The burden of proof is on the party challenging the IEP, in this case, plaintiff, to show why the IEP and resulting placement were inappropriate under IDEA.   See Houston Indep. Sch. Dist. v. Bobby R., 200 F.3d 341, 347 (5th Cir. 2000).   The Court's task

"is not to second-guess state and local policy decisions; rather it is the narrow one of determining whether state and local school officials have complied with the [IDEA]." Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1048 (5th Cir. 1989).

IV.

Background and Relevant Facts

The court finds the following facts by a preponderance of the evidence:

Plaintiff and his parents moved to Keller, Texas from California in October 2005, and enrolled plaintiff in KISD in early November 2005, during plaintiff's seventh grade school year. While in California, plaintiff had been diagnosed with attention deficit hyperactivity disorder ("ADHD") and bipolar disorder. The Los Angeles, California, Unified School District ("LAUSD") had determined that plaintiff was eligible for services under the IDEA as a student with emotional disturbance ("ED"), and placed him in a classroom without "visual clutter," with a low student-to-teacher ratio, and with a consistent group of students and staff members. Plaintiff scored below the California state target in both English/language arts and mathematics.

Based on plaintiff's records and educational services from LAUSD, defendant placed plaintiff in a "Behavior Modification"

6

classroom, which used a system that based the amount of time spent in a special education setting on the student's emotional and behavioral needs and the student's ability to be successful, and which also had behavioral supports and counseling as a related service.   No suspicions of autism were reported by plaintiff's parents at that time, nor was there an indication of autism in any of plaintiff's records.   Plaintiff passed all of his seventh grade classes, and met the state standards on the mathematics and writing sections of the Texas Assessment of Knowledge and Skills ("TAKS") standardized test, but did not meet the state standard for reading.

Prior to the start of plaintiff's eighth grade year, he was admitted to Cook Children's Medical Center ("Cook") on August 8, 2006, and the first mention of a possibility of autism came on August 17, 2006, on a document entitled "Discharge Instructions for Follow-Up Care," which listed diagnostic impressions for (1) mood disorder, (2) pervasive developmental disorder ("PDD"), which is on the autism spectrum,[1] (3) ADHD, combined type, and (4) anxiety disorder.   On September 28, 2006, plaintiff was examined by Whitney A. McGee, Psy.D., who concluded that

---

[1] According to the briefs, the term "autism" encompasses various disorders along a "spectrum" that includes higher-functioning individuals at one end, and lower functioning individuals at the other.  In this case, "autism" includes Asperger's Syndrome (also referred to as Asperger's disorder), and PDD. Other diagnoses of plaintiff are not considered to be on the autism spectrum.

plaintiff's "symptom presentation appeared to be most consistent with diagnoses of Generalized Anxiety Disorder; Bipolar Disorder, Not Otherwise Specified; and Asperger Disorder."  R. 1469.

When plaintiff returned to school, his parents requested that an autism assessment be conducted, and defendant's autism specialist team performed such an assessment on November 14, 2006.  The assessment included information from teachers and school staff, parents, observations of plaintiff, and various tests used in determining whether a child has a form of autism. After completing the assessment, the team concluded that plaintiff's educational profile and behaviors were "consistent with an emotional disturbance versus autism or other pervasive developmental disorder, specifically Asperger's Disorder. Diagnostic criteria were not met with the intensity, frequency, or duration that a diagnosis of Asperger's requires."  R. 1531.

At the time the assessment was administered, plaintiff attended one class per day in the special education class, and attended the remainder of his classes in the general education mainstream, with behavior modification support during the day. The team recommended continuing those accommodations and others in place at the time.  Shortly thereafter, the ARDC convened to review the assessment, determined that plaintiff would remain eligible for services as a student with ED, added a special

8

education study skills class, and decided that plaintiff should begin and end his school day in the behavior modification class to help him get ready and organize his homework.  Plaintiff's parents disagreed with the conclusion, declined an opportunity to reconvene within 10 days, and received a copy of the procedural safeguards, which set forth their legal rights in resolving disagreements, including their right to a due process hearing.

In February 2007, the next ARDC meeting occurred, and school officials requested that a psychological evaluation be conducted for the three-year re-evaluation.  The ARDC report also noted that plaintiff met the state standards in mathematics and writing, but not in reading; that he had made "great improvements socially" and was working well with peers; and that his problematic behaviors included fidgeting, playing with study materials, and making loud comments.  In the accompanying behavioral intervention plan ("BIP"), defendant noted strategies to be implemented in order to help plaintiff manage behaviors and different situations, such as removing distractions, providing structure, and setting well-defined limits and expectations.  At that time, plaintiff's IEP documents contained various accommodations and notations, including (1) instructional modifications such as being provided with study notes, having more time to complete assignments, dividing his work into smaller

segments, receiving support from the behavioral modification teachers, and preferential seating in class; (2) behavioral management strategies such as clearly defined limits, frequent reminders of rules, and positive reinforcement; and (3) goals for successfully taking TAKS. The IEP called for plaintiff to be placed into the general education mainstream for all classes with the exception of study skills, that he would receive counseling for 60 minutes every two weeks, and that he "may be pulled into [behavioral modification class] based on anxiety levels/behaviors as a place to cool down and then work his way back into the classroom." R. 7116. Plaintiff's parents indicated that they agreed with the IEP, but disagreed with the diagnosis of plaintiff as a student with ED rather than autism. On March 2, 2007, defendant provided plaintiff's parents with a written notice of refusal to change plaintiff's identification to a student with autism, and provided them with a copy of the procedural safeguards.[2]

A few months later, in May 2007, defendant's licensed specialist in school psychology ("LSSP") conducted a psychoeducational assessment, which involved a review of records

---

[2] The record reflects that each time there was a disagreement or any other situation calling for written notice or procedural safeguards to be provided to the parents, such provisions were made by defendant. Thus, the court need not repeat each and every instance of defendant making such provisions.

and prior assessments; information from parents and teachers,
observation data, interviews with plaintiff himself, and various
tests.  The LSSP considered the information, and determined that
plaintiff "continue[d] to exhibit an educational profile and
behaviors that are consistent with an Emotional Disturbance as
defined by the Texas Education Agency."  R. 7142.  On May 21,
2007, the ARDC convened to discuss the assessment, and agreement
was not reached on the diagnosis, leading to a follow-up ARDC
meeting on May 25, 2007.  At the May 25 meeting, plaintiff's
parents provided an attachment setting forth their disagreements,
and requesting placement in a self-contained special education
class with fewer students and fewer distractions.  The ARDC
agreed to place plaintiff in the behavior modification class at
the beginning of the following school year until he was ready for
general mainstream classes.  Plaintiff passed all of his eighth
grade classes, and met the state standards in reading, social
studies, and science, but did not meet the standard in
mathematics.

At the beginning of plaintiff's ninth grade year, the ARDC
met several times, and determined that plaintiff should gradually
transition from the self-contained "charger room," which was
similar to the behavior modification room and designed to provide
extra help to plaintiff and to prepare him for general education

11

classes with additional support.  The ARDC determined that if
plaintiff met all state and district standards, he would graduate
from high school in June 2011.  Plaintiff's parents requested and
received an independent educational evaluation ("IEE") at
defendant's expense, selecting Dr. David Welsh ("Welsh") from a
list of approved providers.  Welsh considered information from a
number of sources: plaintiff's educational records, previous
psychoeducational evaluations, the psychological evaluation from
Cook, two conferences with plaintiff's ninth grade teachers, a
clinical interview with plaintiff, two conferences with
plaintiff's parents, and a conference with plaintiff's private
psychologist.  After considering the above information, Welsh
concluded that "[a]lthough [plaintiff] may exhibit some social
immaturity and certain behavioral idiosyncrasies, these data
clearly indicate that [plaintiff] does _not_ exhibit an autism-
spectrum disorder."  R. 7308.  The ARDC met to review the IEE,
determined that plaintiff continued to be eligible to receive
services as a student with ED, and recommended that plaintiff
begin the following year, tenth grade, in all general education
classes with support from the charger room for thirty minutes per
week.  Plaintiff passed all of his ninth grade classes except for
a first-semester art class and a second-semester technology

class, and earned seven credits toward high school graduation.
On TAKS, he met the state standards for reading and mathematics.

The ARDC met shortly after plaintiff began tenth grade, at
which time plaintiff was passing all of his classes, and the ARDC
completed all necessary paperwork.  It was noted that plaintiff's
behavior was improving, and therefore a BIP was no longer
necessary and any behavioral concerns could be addressed solely
through the IEP.  The ARDC determined that plaintiff should
continue the general education classes with support, and
plaintiff's parents indicated agreement.

On January 20, 2009, plaintiff withdrew from KISD and began
attending the University of Texas's University Charter School
("UCS"), which is associated with the Meridell Achievement Center
("Meridell") residential facility in Austin, Texas.  UCS
officials convened an ARDC meeting for plaintiff, and continued
his eligibility as a student with ED.  His discharge summary
listed his diagnoses as (1) bipolar, most recent episode, mixed,
currently mild; (2) organic mood disorder secondary to cerebral
dysrhythmia; and (3) Asperger's Syndrome.  Plaintiff passed all
of his tenth grade classes except one semester of recordkeeping,
and earned 6.5 credits toward graduation.  He met the TAKS state
standard in English/language arts, mathematics, social studies,
and science.

When plaintiff returned to KISD for his eleventh grade year, the ARDC convened and recommended a psychological evaluation. A UCS representative participated in the meeting, and suggested that plaintiff be placed in a combination of general and special education classes. The ARDC agreed to place plaintiff in the charger room with gradual transition into general education classes. The psychological evaluation was conducted by another LSSP on October 7, 2009, and included interviews with plaintiff and with his parents, information provided by plaintiff and his parents, information provided by teachers, and various approved tests and diagnostic techniques. The evaluator concluded that plaintiff continued to exhibit some emotional factors that appeared to be interfering with educational progress to the extent that ED was present.

The next ARDC, on October 21, 2009, did not reach consensus, as the parents and school officials disagreed on plaintiff's diagnoses; the parents wanted plaintiff in general education, but with smaller classes than he was attending at the time; and school officials recommended that plaintiff continue in the general education classes with support from the charger room. The ARDC asked the parents to identify the types of services or supports they felt plaintiff needed but was not receiving and stated that school officials were willing to consider adding

14

specific supports, but the parents did not identify any aditional

services or supports they wanted for plaintiff.  The parents

requested a functional behavior assessment ("FBA"), which the

ARDC agreed to, and the FBA was conducted on December 10, 2009.

The FBA resulted in various recommendations, such as continuing

current behavioral supports, directly teaching social skills to

plaintiff, and having coordination between parents and school

officials.

The ARDC met to review the FBA and develop a BIP, at which

time plaintiff's parents informed officials that plaintiff had

been an outpatient at Springwood Hospital, and that his

psychiatrist was recommending homebound placement.  The

psychiatrist completed the Homebound Needs Assessment ("HNA") on

January 14, 2010, recommending homebound placement through mid-

February due to severe anxiety, depression, and irritability.  At

the next ARDC meeting, the parents produced the HNA and also

requested smaller classes for plaintiff.  The ARDC did not agree

that plaintiff needed homebound instruction.  Instead, officials

recommended that plaintiff initially receive all instruction in

the charger room when he returned, with gradual transition into

general classes with support, and that special education

counseling be added as a specific service.  The ARDC reconvened

on January 20, 2010, discussed various concerns, agreed to an

assistive technology ("AT") assessment, and recommended a variety of specific services for plaintiff: a small group setting in the charger room, individualized instruction, special education counseling for social skills, behavioral contracts, a visual schedule, and transportation. However, plaintiff did not return to KISD for the 2010 spring semester.

The ARDC met on January 28, 2010, to reconsider homebound services, and agreed to provide homebound instruction for 120 minutes, twice per week, through February 15, 2010. Defendant provided some, but not all, of the homebound instruction prior to the expiration of the HNA. School officials requested permission to speak with plaintiff's physician, but the parents declined to grant such permission. The next two ARDC meetings concerned the issue of homebound placement and KISD's continued requests to consult with plaintiff's physician; however, the parents continued to deny permission to speak with the physician. Another HNA was sent to defendant, which had concerns about the source and contents of it, and defendant requested the parents' consent to speak with the physician who had completed the HNA, which was denied. Defendant offered to allow the parents to be present when it called the physician, but the parents refused consent. A ten-day recess was agreed to, and the ARDC reconvened

on February 22, 2010, at which time defendant again requested to speak with the physician, but permission was refused.

On March 1, 2010, plaintiff's parents requested a copy of his educational records, which defendant produced, and the parents filed a complaint with the Texas Education Agency ("TEA") containing various grievances against defendant.  TEA determined that defendant had failed to ensure that plaintiff had received all of his homebound services, and ordered the ARDC to consider compensatory instruction.  TEA also concluded that proper procedures had been followed in administering TAKS and in identifying plaintiff's eligibility for services, which had been two of plaintiff's other grievances.

Defendant sent a letter to plaintiff's parents on May 3, 2010, requesting that the parents schedule plaintiff's annual ARDC meeting, provide consent for school officials to speak with plaintiff's physician, and provide consent for KISD to conduct a medical evaluation by a psychiatrist.  The parents declined all of the requests.  At plaintiff's ARDC meeting on May 27, 2010, the committee again requested a medical evaluation, and the parents again declined.  At the time of this meeting, plaintiff had not been attending school for the entire semester, and was failing his classes as a result.  KISD's transition specialist attended the meeting to assist with planning for plaintiff's

17

transition back to school.  Prior to the meeting, the specialist
sent the parents a survey to complete with plaintiff and bring to
the meeting, but the parents failed to bring the survey.

The ARDC developed new goals and objectives to decrease
plaintiff's anxiety, improve his social interactions with peers
and adults, and increase academic productivity.  The ARDC
recommended starting the following school year in the charger
room and gradually transitioning plaintiff to general education
classes with support, and recommended various instructional
accommodations for plaintiff: note-taking assistance, extended
time for assignments, preferential seating, change in project
requirements, checking for understanding, extra time for oral
responses, proximity control, organizational assistance, access
to the charger room, frequent breaks, private discussion
regarding behavior breakdowns, and close supervision of computer
use.  The parents did not sign the IEP, and did not return the
transition survey documents.

Plaintiff passed all of his eleventh grade fall semester
classes, when he had been attending school, but failed all of his
spring semester classes due to his absence from school.  He also
did not take TAKS due to his absence.  Defendant offered the
compensatory instruction ordered by TEA over the summer, and
plaintiff accessed some of this instruction, but was placed in a

residential facility at Meridell on June 29, 2010, before the
instruction could be completed.   Defendant attempted to complete
the compensatory instruction by paying for the instruction at the
residential facility, but the parents declined the offer.
Plaintiff attended UCS over the summer, where staff conducted a
re-evaluation.   Evaluators concluded that plaintiff demonstrated
characteristics of autism or other PDD, qualified for services as
a student with ED and autism, and continued to have a need for
services as a student with ED.   A subsequent evaluation by UCS
staff noted that plaintiff's primary disability was ED, and his
secondary disability was autism.

When plaintiff returned home in October 2010 and enrolled at
Timber Creek High School, a different school in KISD, to repeat
the eleventh grade, the ARDC conducted a transfer meeting.   The
ARDC continued to accept plaintiff's eligibility for ED, but
requested permission from the parents to conduct an autism
assessment.   The parents refused to give such permission, and
presented the ARDC with a report from the Ziggurat Group, which
noted that plaintiff had a history of multiple diagnoses, and
stated that plaintiff's behaviors were "consistent with those of
individuals diagnosed with Asperger's Disorder." R. 7718.   The
report recommended that KISD "serve [plaintiff] under the
categories of Autism or Other Pervasive Developmental Disorders

19

(Primary), Emotional Disturbance (Secondary), and Speech Impaired (Tertiary)." R. 7718-19. The ARDC reviewed the report, and recommended that plaintiff be placed in the positive behavior support ("PBS") classroom, where he "would likely be one of just a few students," and where he would receive support. R. 7807. Plaintiff's parents and his advocate disagreed, and felt that residential placement was appropriate for plaintiff. The school principal explained that officials were not ready to recommend residential placement without having been able to work with plaintiff, and that the school would like 30 days to get to know him, and to be better able to determine whether residential placement was appropriate for him. Defendant offered to provide the remaining hours of compensatory homebound instruction, but the parents declined the offer.

Plaintiff's physician completed another HNA, recommending that plaintiff remain at home from October 19, 2010, through February 19, 2011; however, the parents never gave the school permission to speak with the physician regarding the HNA. On December 1, 2010, plaintiff's parents informed the school that they had unilaterally placed him at the Vanguard Preparatory Academy ("Vanguard"). The parents had not provided written notice prior to placing plaintiff at Vanguard.

On December 16, 2010, the ARDC conducted its annual meeting,
and the parents did not attend.  The ARDC reviewed the recent
HNA, all evaluation data from the Ziggurat Group, UCS/Meridell,
and KISD, and the parents' request for private placement of
plaintiff at Vanguard.  Defendant requested consent from the
parents to speak with representatives from Vanguard,
UCS/Meridell, Ziggurat Group, and with plaintiff's physician, but
no consent was given.  The ARDC continued plaintiff's eligibility
as a student with ED, developed a BIP, developed goals and
objectives to help plaintiff improve his social skills,
recommended special education transportation and counseling,
continued the instructional accommodations that plaintiff had
been receiving, and recommended initial placement in the smaller
setting of the PBS classroom.  Plaintiff never returned to KISD.

On February 28, 2011, plaintiff filed a request for a due
process hearing with TEA, contending that defendant did not
provide him with a FAPE as required by the IDEA.  After more than
a year of pre-hearing conferences, motions, and discovery, a
nine-day due process hearing was conducted, a record of 11,337
pages was generated, and the SEHO concluded on July 8, 2012, that
defendant had complied with the IDEA's requirements, defendant
had provided plaintiff a FAPE, and plaintiff's parents were not
entitled to reimbursement of private school tuition, nor any

other relief.  The SEHO further determined that the one-year

statute of limitations barred any of plaintiff's claims that

accrued prior to February 28, 2010.

### V.

### The Parties' Contentions

Plaintiff contends that he was denied the FAPE to which he

was entitled under the IDEA.[3]  Defendant contends that it

complied with all procedural requirements, developed an IEP for

plaintiff that was reasonably calculated to provide him with an

educational benefit and therefore provided plaintiff with a FAPE,

and that plaintiff is entitled to no relief.

### VI.

### Analysis[4]

A.   Whether Plaintiff Received a FAPE

The primary vehicle through which a FAPE is provided is a

student's IEP, and the determination of whether a student

received a FAPE is typically made by evaluating the student's IEP

---

[3] In plaintiff's statement of contentions, filed on April 23, 2013, he contended that the SEHO erroneously concluded that (1) many of plaintiff's claims were barred by the statute of limitations, and (2) defendant committed procedural violations of the IDEA by misrepresenting or withholding information.  It appears, however, that plaintiff has abandoned both of these issues, as his brief contains no argument whatsoever regarding the statute of limitations, and the remaining arguments in the brief relate to whether plaintiff's IEP was appropriate and whether his private placement was appropriate under the IDEA, without mention of procedural violations.  Thus, the court addresses only the contentions plaintiff raises in his brief.

[4] All facts recited under this heading are facts the court has found by a preponderance of the evidence.

22

and its implementation.  In deciding whether an IEP is
appropriate and, therefore, whether a student received a FAPE,
the court must ask (1) whether the state or local agency complied
with the procedures set forth in the Act, and, if so, (2) whether
the IEP was "reasonably calculated to enable the child to receive
educational benefits."  Rowley, 458 U.S. at 201.  As there is no
evidence cited in this case that defendant failed to comply with
the statutory procedures, and plaintiff does not raise the issue
in his brief, the court concludes that proper procedures were
followed, and now addresses whether plaintiff's IEP was
appropriate.

The Fifth Circuit has developed four factors in evaluating
whether an IEP is reasonably calculated to enable the student to
receive educational benefits: (1) whether the program is
individualized on the basis of the student's assessment and
performance; (2) whether the program is administered in the least
restrictive environment; (3) whether the services are provided in
a coordinated and collaborative manner by the key "stakeholders;"
and (4) whether positive academic and non-academic benefits are
demonstrated.  Michael F., 118 F.3d at 253.  The Fifth Circuit
has treated the factors "as indicators of when an IEP meets the
requirements of IDEA, but [has] not held that district courts are
required to consider them or to weigh them in any particular

23

way." Richardson Indep. Sch. Dist. v. Michael Z., 580 F.3d 286, 293 (5th Cir. 2009); Hovem, 690 F.3d at 396. Because the one-year statute of limitations applies, the court considers the the IEPs in place on or after February 28, 2010.[5]

1.   Whether the IEPs Were Individualized

In determining whether the IEPs developed for plaintiff were adequately individualized to meet his specific needs, the court addresses (1) plaintiff's contention that defendant should have classified him as eligible for services as a student with autism, not a student with ED, and (2) whether the actual content and implementation of plaintiff's IEPs were sufficiently individualized.

a.   Effect of Disability Classification

Plaintiff's primary contention is that because defendant did not accept the diagnosis of autism and instead classified plaintiff as ED, plaintiff's IEP was not appropriately individualized and plaintiff was denied a FAPE.   Indeed,

---

[5] The IDEA provides:

> A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.

20 U.S.C. § 1415(f)(3)(C); 34 C.F.R. § 300.511(e).  Texas has adopted an explicit one-year statute of limitations, 19 Tex. Admin. Code § 89.1151(c).  Plaintiff filed his due process complaint on February 28, 2011; therefore, only the IEPs in place on or after February 28, 2010 need be analyzed under the Michael F. factors.

24

plaintiff devotes a considerable portion of his brief arguing that he suffers from a disorder on the autism spectrum, that there was "overwhelming evidence" of his autism, and that defendant misdiagnosed his disability and refused to consider him as a student with autism.  Pl.'s Br. at 13-19.  Plaintiff spends comparatively little time explaining what additional services defendant should have provided him, and how those services would have made plaintiff's IEP sufficiently individualized.

The IDEA requires school districts to identify students with disabilities and provide individualized services to those students; however, "[n]othing in this chapter requires that children be classified by their disability so long as each child who has a disability listed in section 1401 of this title and who, by reason of that disability, needs special education and related services is regarded as a child with a disability under this subchapter."  20 U.S.C. § 1412(a)(3)(B).  "Given the IDEA's strong emphasis on identifying a disabled child's specific needs and addressing them . . . the particular disability diagnosis affixed to a child in an IEP will, in many cases, be substantively immaterial because the IEP will be tailored to the child's specific needs."  Fort Osage R-1 Sch. Dist. v. Sims, 641 F.3d 996, 1004 (8th Cir. 2011).  Indeed, "[t]he IDEA concerns itself not with labels, but with whether a student is receiving a

25

free and appropriate education." <u>Heather S. v. State of</u>
<u>Wisconsin</u>, 125 F.3d 1045, 1055 (7th Cir. 1997).  In <u>Heather S.</u>,
the court noted that "the school [was] dealing with a child with
several disabilities, the combination of which in Heather make
her condition unique from that of other disabled students," and
also explained that "[t]he IDEA charges the school with
developing an appropriate education, not with coming up with an
proper label with which to describe Heather's multiple
disabilities." <u>Id.</u> See also <u>D.B. v. Houston Indep. Sch. Dist.</u>,
No. Civ. A. H-06-354, 2007 WL 2947443, at *10 (S.D. Tex. Sept.
29, 2007) ("IDEA does not require that children be classified by
their disability so long as each eligible child is regarded as a
child with a disability under the Act.").

Plaintiff argues that the label of autism is important
because, under Texas law, plaintiff would be legally entitled to
additional services as a student with autism, and that such
services were "not even considered" because plaintiff was
designated as a student with ED.  Reply at 4; 19 Tex. Admin. Code
§ 89.1055(e).[6]  However, like the plaintiff in <u>Heather S.</u>, the
diagnoses of plaintiff have been mixed.  Considering the evidence
in the record, it is not certain that plaintiff suffers from a

---

[6] Section 89.1055(e) contains provisions regarding the content of IEPs for students who are
eligible for special education services under the classification of autism.

form of autism and would be declared eligible for services as a student with autism under Texas law, 19 Tex. Admin. Code § 89.1040(c)(1) and 34 C.F.R. § 300.8(c)(1), which contain definitions for autism.  Although plaintiff contends in his reply that no one seems to contest that plaintiff has Asperger's, almost every evaluation--private or public--of plaintiff indicates multiple and/or varying diagnoses, some of which include and some of which exclude Asperger's.  As far as the strategies and services under § 89.1055(e), the record reflects that defendant considered such services and strategies, implemented many of them, and asked the parents specifically which additional services they wanted that defendant was not providing.[7]

Plaintiff relies on a Ninth Circuit case, Weissburg v. Lancaster Sch. Dist., 591 F.3d 1255, 1259 (9th Cir. 2010), for an argument that a change in classification of plaintiff from ED to autistic "would have changed his legal rights vis-a-vis KISD," and would have legally entitled him to each and every strategy under § 89.1055(e).  Reply at 3.  However, Weissburg, while containing some similar facts and addressing some of the legal

---

[7] The record indicates that, in assessing plaintiff's specific needs and formulating specific strategies, the ARDC considered and/or implemented seven of the eleven strategies listed under § 89.1055(e).  There is no evidence cited that the ARDC was asked specifically to implement any of the remaining strategies.

implications of disability classifications, discussed such legal implications in the context of a California state law requiring autistic students to be taught only by teachers certified to teach such students, and is inapposite to this action. Weissburg, 591 F.3d at 1259-60. The fact remains that the federal law at issue in this case, the IDEA, provides no specific right for a student to be classified under a particular disability, but requires that the student's educational program be designed to suit the student's demonstrated needs. While certainly an autistic child may generally have different needs than a child with ED, the evidence shows that defendant studied and focused on the individual needs of this particular child, and attempted to develop a program that suited this child's needs. The fact that plaintiff believes he was mislabeled does not automatically mean that he was denied a FAPE. Thus, the court looks not to whether plaintiff was properly labeled as ED or autistic, but whether the IEP itself was sufficiently individualized to meet plaintiff's unique needs and provide him with educational benefits.[8]

---

[8] Plaintiff has been diagnosed with a vast array of disorders and conditions, beginning when he was in the second grade. At some instances, often within the same evaluation, the assessments have listed diagnoses for multiple disorders, and, plaintiff has been diagnosed with one or more of the following at different points in time: ED, generalized anxiety disorder, bipolar disorder, PDD, mood disorder, depression, ADHD, and Asperger's disorder. Plaintiff's parents and some of the reports requested that plaintiff's IEP list both ED and an autism spectrum disorder as plaintiff's eligibility categories; however,

(continued...)

b.    Individualized Nature of Plaintiff's IEP

Evaluation procedures for determining the content of a

student's IEP are delineated in federal regulations, specifically

34 C.F.R. § 300.304, which requires that school districts:

> (1) Use a variety of assessment tools and strategies to
> gather relevant functional, developmental, and academic
> information about the child, including information
> provided by the parent. . . .
>
> (2) Not use any single measure or assessment as the
> sole criterion for determining whether a child is a
> child with a disability and for determining an
> appropriate educational program for the child; and
>
> (3) Use technically sound instruments that may assess
> the relative contribution of cognitive and behavioral
> factors, in addition to physical or developmental
> factors.

34 C.F.R. § 300.304(b). The IDEA requires a child's IEP team to

"consider the use of positive behavioral interventions and

supports, and other strategies, to address [the] behavior" of a

"child whose behavior impedes the child's learning or that of

others. . . ." 34 C.F.R. § 300.324(a)(2)(i); 20 U.S.C. §

---

[8](...continued)
to do so would be in violation of federal regulations. Under 34 C.F.R. § 300.8(c)(ii), "Autism does not apply if a child's educational performance is adversely affected primarily because the child has an emotional disturbance, as defined in paragraph (c)(4) of this section." The fact that even the private evaluations listed ED as a primary diagnosis and Asperger's or another form of autism as a secondary diagnosis, and defendant's evaluations listed ED as the primary diagnosis, indicates that the evidence was hardly "overwhelming," as plaintiff suggests, but ambiguous at best. The facts indicate that no one was certain about which disorder(s) plaintiff suffered from, and that it was proper for defendant to exclude autism eligibility for plaintiff.

1414(d)(3)(B)(i); R.P. v. Alamo Heights Indep. Sch. Dist., 703
F.3d 801, 813 (5th Cir. 2012).

In the approximately five years plaintiff attended KISD, "he
had a plethora of evaluations performed, or funded, by KISD,"
including an autism evaluation, two psychological evaluations, an
IEE, and a formal FBA.  R. 30-31.  All such evaluations employed
various assessment tools, gathered information from a variety of
sources including plaintiff, his parents, teachers, evaluators,
physicians, and psychologists.  Tests that were conducted were
recognized as valid and appropriate for evaluating plaintiff's
disabilities, and were performed by qualified personnel and
according to the instructions provided by the creators of the
tests.  For example, defendant completed a psychological
assessment on October 7, 2009, the results of which were
considered in setting the IEP that was in place during 2009 and
2010.  The evaluator conducted a clinical interview with
plaintiff, a separate interview with the parents, collected
information from plaintiff's teachers and from plaintiff's
educational records, utilized approximately nine different tests
and/or testing instruments, and determined that ED was present.
The ARDC met two weeks later to review the results of the
assessment, at which time the parents requested that plaintiff's
eligibility be changed to autism and an FBA be performed.

An FBA was then performed by an LSSP, who noted various behaviors affecting plaintiff's progress, such as refusal to complete work, disrespectful attitude, and difficulty engaging in age-appropriate social and coping skills. The ARDC met again to review these results, at which time it learned that plaintiff's psychologist was recommending homebound placement. More meetings ensued, and the ARDC recommended that when plaintiff returned to school, he receive instruction in the charger room initially with gradual integration into general education. He would receive individualized instruction, special education counseling for social skills and working on his behavioral issues, a behavioral contract, transportation, and other accommodations. The meetings, discussions, and specific recommendations for plaintiff continued in fall 2010, as discussed _supra_, part III.

The evidence shows that proper evaluations were conducted, defendant considered those evaluations plus input from the parents and the private evaluations, and defendant developed a program specifically individualized to address plaintiff's unique needs. The ARDC met frequently, much more frequently than required by statute; reviewed each and every evaluation and assessment; and developed specific accommodations, services, and strategies in response to the evaluations, assessments, and observations of plaintiff. These accommodations, services, and

strategies focused on all aspects of plaintiff's education,

academic and non-academic, regardless of the disability label, to

help plaintiff succeed in multiple areas of his development.   The

fact that the parents disagreed with the conclusions of the ARDC,

some of the content of the IEPs, or the eligibility category does

not mean that the IEP was not appropriately individualized for

plaintiff.

>    2.    Whether the IEP Was Administered in the Least
>          Restrictive Environment

One of the primary mandates of the IDEA "is 'mainstreaming,'

which is the requirement that an IEP place a disabled child in

the least restrictive environment for his education."   R.H. v.

Plano Indep. Sch. Dist., 607 F.3d 1003, 1008 (5th Cir. 2010).

The IDEA provides:

> To the maximum extent appropriate, children with
> disabilities, including children in public or private
> institutions or other care facilities, are educated with
> children who are not disabled, and special classes,
> separate schooling, or other removal of children with
> disabilities from the regular educational environment
> occurs only when the nature or severity of the
> disability of a child is such that education in regular
> classes with the use of supplementary aids and services
> cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).   However, even when a school district

can place a child in mainstream classes, it "need not provide for

an exclusively mainstreamed environment;" rather, the IDEA

"requires school officials to mainstream each child only to the

maximum extent appropriate." <u>Daniel R.R. v. State Bd. of Educ.</u>,
874 F.2d 1036, 1045 (5th Cir. 1989).  In <u>Daniel R.R.</u>, the Fifth
Circuit explained the test for determining whether an IEP is
delivered in the least restrictive environment:

> First, we ask whether education in the regular
> classroom, with the use of supplemental aids and
> services, can be achieved satisfactorily for a given
> child.  <u>See</u> § 1412(5)(B).  If it cannot and the school
> intends to provide special education or to remove the
> child from regular education, we ask, second, whether
> the school has mainstreamed the child to the maximum
> extent appropriate.  <u>See id.</u>  A variety of factors will
> inform each stage of our inquiry; the factors that we
> consider today do not constitute an exhaustive list of
> factors relevant to the mainstreaming issue.  Moreover,
> no single factor is dispositive in all cases.  Rather,
> our analysis is an individualized, fact-specific inquiry
> that requires us to examine carefully the nature and
> severity of the child's handicapping condition, his
> needs and abilities, and the schools' response to the
> child's needs.

<u>Daniel R.R.</u>, 874 F.2d at 1048.

School officials attempted to place plaintiff in mainstream
classes to the maximum extent possible, in keeping with the
requirements of the IDEA.  His IEP explained that he would be
placed in the charger room as needed, where there was a low
student-to-teacher ratio, to help him with anxiety, study skills,
and other related issues, but that the goal was to help him
transition successfully into mainstream classes.  The IEP also
listed specific accommodations for plaintiff to receive while
attending general education classes to help him succeed in that

environment and make satisfactory achievements and progress.
When he attended school, plaintiff was generally passing his
classes, earning high grades in some classes, receiving positive
feedback from teachers, and meeting the state standards on his
most recent TAKS, all of which indicate that plaintiff could
achieve a satisfactory education in a regular classroom and did
not require placement completely separate from non-disabled
students.  His teachers did not report any extraordinary behavior
problems or extreme anxiety, and when plaintiff did exhibit
anxiety, he had the option of the charger room to help reduce
such anxiety.  Each time plaintiff returned to school from
another environment, school officials recognized that plaintiff
needed some additional support and placed him in a self-contained
environment and helped him transition to general classes.  Thus,
the evidence reflects that plaintiff's IEPs were or would have
been delivered in the least restrictive environment.

   3.   Whether the Services Were Provided in a Coordinated and
        Collaborative Manner by the Key "Stakeholders"

   The IDEA provides that the IEP team consists of the parents,
at least one regular education teacher of the student, at least
one special education teacher of the student, a representative of
the school district who is qualified to provide specially
designed instruction and is sufficiently knowledgeable about the

general education curriculum and availability of resources, and
an individual who can interpret the instructional implications of
evaluation results.  20 U.S.C. § 1414(d)(1)(B).  In addition, at
the parents' or agency's discretion, the team may include other
individuals who have knowledge or special expertise regarding the
student.  Id.

Plaintiff's parents, still focusing on their disagreement
with plaintiff's eligibility category, contend that the services
were not delivered in a coordinated and collaborative manner by
the key stakeholders because the committee "hardly worked
harmoniously," meetings frequently ended without consensus, the
ARDC refused to accept plaintiff's autism diagnosis even with the
addition of the Ziggurat Group's report, and the ARDC failed to
read the report carefully enough.  Pl.'s Br. at 20; Reply at 6.
The parents also complain that even though defendant agreed to
provide some homebound services, it "failed to actually deliver
what it had promised."  Id.  However, during the time period in
question, the record reflects that the parents refused some of
the homebound services offered, and blocked defendant's requests
to collaborate and to help plaintiff succeed.  The parents
consistently refused to allow defendant to consult with
plaintiff's physicians regarding homebound services and various
diagnoses, refused to provide consent for the school to perform

an autism assessment in 2010, placed plaintiff in a private school without providing the statutorily required notice, and refused to attend the December 16, 2010 ARDC meeting.

While the IDEA gives the parents the right to provide meaningful input, this right "is simply not the right to dictate the outcome and obviously cannot be measured by such." White v. Ascension Parish Sch. Bd., 343 F.3d 373, 380 (5th Cir. 2003). "If a student's parents want him to receive special education under IDEA, they must allow the school itself to reevaluate the student and they cannot force the school to rely solely on an independent evaluation." Andress v. Cleveland Indep. Sch. Dist., 64 F.3d 176, 178 (5th Cir. 1995). A parent who disagrees with the school's evaluation has the right to have an independent evaluation conducted, and the evaluation must be considered by the school district. Id.; 34 C.F.R. § 300.503.

The record evidence shows that the ARDC met frequently, included all required and relevant individuals, considered all reports provided by plaintiff from various physicians, groups, and entities, attempted to include officials from Vanguard, attempted to obtain input from plaintiff's physicians, and attempted to conduct its own autism assessment of plaintiff in order to develop an appropriate IEP. In addition, specifically regarding the parents' argument about homebound services,

36

defendant was not required to consent to such restrictive services, particularly when considering the parents' refusal to allow communication between the recommending physician and school officials, and the school district's obligation to deliver the FAPE in the least restrictive environment. See Marc V. v. Northeast Indep. Sch. Dist., 455 F. Supp.2d 577, 594 (W.D. Tex. 2006) (when parents refused to allow the school district's professional staff to speak with the physician who recommended homebound placement, the ARDC did not have enough credible evidence to support such a restrictive placement and was not required to consent to it). With regard to the Ziggurat report, the record reflects that the ARDC took sufficient time to read the report, considered the report, requested its own opportunity to evaluate plaintiff, and eventually disagreed with the conclusions reached in the report. The fact that the parents disagreed with some of the ARDC's recommendations does not mean that the services were not offered in a coordinated and collaborative fashion, particularly when the ARDC asked to do its own evaluation in light of the Ziggurat report, and the court concludes that there was adequate coordination and collaboration.

4.   <u>Whether Positive Academic and Non-Academic Benefits
     Were Demonstrated</u>

The accounts of the parties differ dramatically as to

whether plaintiff benefitted academically and non-academically

from the IEP developed by the ARDC; however, in considering the

facts contained in the record, plaintiff received sufficient

educational benefits to comply with the IDEA's requirements.

Academically, when plaintiff actually attended school in KISD, he

was passing his classes and meeting the state standard in most

subject areas.  On plaintiff's most recent TAKS, he met the

standard in all areas, indicating that he was progressing at

grade level.  He was also on track to graduate from high school

on time, had he not been absent from school for the entire spring

2010 semester.  In other areas, teachers reported that plaintiff

was engaged in class, was enjoyable to have in class, did not

exhibit signs of excessive stress, was progressing socially in

such ways as learning to wait patiently to be called on while

having his hand raised, learning to resolve conflicts between

himself and his peers, becoming more eager to participate in

class, and volunteering for such classroom activities as reading

a part in a play.

Plaintiff states that he "failed the eleventh grade" while

enrolled in KISD.  Pl.'s Br. at 21.  While it is true that

38

plaintiff received failing grades for the spring semester,
plaintiff's above statement is misleading, as the evidence shows
plaintiff passed his fall semester classes, but failed his spring
semester classes due to his excessive absence.  Plaintiff also
argues that the school environment was so stressful that it
caused him to suffer anxiety attacks and to be placed in
residential programs or stay at home frequently.  Plaintiff
argues that because of the stress and these placements, whatever
"modest success" plaintiff achieved, he "on the whole performed
poorly" and he did not receive any benefit beyond de minimis.
Id. at 22.  While the court is concerned about plaintiff's having
to be admitted to residential facilities and psychiatric
programs, and his parents may feel that plaintiff could have or
should have received better services that would have led to more
positive results for plaintiff, the core of the IDEA is to
provide access to educational opportunities, and requires only
the "basic floor of opportunity," and some meaningful educational
benefits more than de minimis, not a perfect education and not
the maximization of plaintiff's potential.  Considering
plaintiff's academic progress in the classes he attended and on
TAKS, the positive feedback from teachers, the observations of
evaluators, and the opinion of the SEHO who had the opportunity
to observe witnesses and make credibility determinations, the

court concludes that plaintiff gained some measurable educational benefits sufficient to comply with the IDEA.

*   *   *   *

Overall, defendant repeatedly attempted to provide plaintiff with a FAPE in compliance with the IDEA, developing individualized IEPs and BIPs; conducting multiple evaluations of plaintiff; promptly and carefully reviewing the results of the evaluations and using those results to further individualize plaintiff's IEPs; communicating with plaintiff's parents and teachers regarding plaintiff's specific needs and ways to help plaintiff; scheduling and conducting ARDC meetings frequently; considering their own evaluations as well as private evaluations of plaintiff; and ultimately making educational recommendations in compliance with the IDEA and regulations.  Clearly, there were disagreements between school officials and plaintiff's parents, but considering the facts in the record and the laws at issue in this action, the court finds that the IEP developed for plaintiff was adequate, and defendant provided plaintiff with a FAPE in accordance with the requirements of the IDEA.

B.    Whether Plaintiff is Entitled to Reimbursement for Private Placement Tuition

If a suitable public educational placement is not available for a disabled child within a state or local school district, the

district must pay the costs of sending the child to an appropriate private institution.  Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ., 790 F.2d 1153, 1158 (5th Cir. 1986).  Under 34 C.F.R. § 300.148, a school district is not required to pay for the costs of a student's private education if the school district made a FAPE available, but the parents decided to place the student in a private school or facility anyway.  34 C.F.R. § 300.148(a).  Disagreements regarding a FAPE are subject to due process procedures, and the school district may be ordered to reimburse parents for private school tuition if (1) the district is not making a FAPE available, and (2) the private placement is appropriate.  Id. at 300.148(c); Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 369-70 (1985).

As the court has already determined that defendant offered plaintiff an individualized and appropriate IEP and made a FAPE available, plaintiff cannot satisfy the first prong of this analysis.  In addition, section 300.148(d) precludes a plaintiff from reimbursement if (1) at the most recent IEP meeting that the parents attended, they did not state their intent to enroll the student at a private school at public expense; (2) the parents did not provide written notice at least ten business days prior to the removal of the student from public school of their intent to place the student at a private school at public expense; (3)

41

the school district informed the parents of its intent to evaluate the student and the parents did not make the child available for testing; or (4) there is a judicial finding of unreasonableness with respect to actions taken by the parents. The record reflects that the parents did not explicitly state their intentions at the October 2010 ARDC meeting regarding the IEP, nor did they provide written notice that they were removing plaintiff from KISD prior to such removal.  The parents also refused to allow defendant to evaluate plaintiff in light of the new Ziggurat Group diagnosis.

In addition, as discussed _supra_, part IV.B, the parents refused to allow defendant to perform its own assessment of plaintiff and refused to allow the school district to communicate with plaintiff's physicians or his teachers from Vanguard, and refused to attend the December 16, 2010 ARDC meeting to discuss concerns.  Whether or not a FAPE is provided, courts can deny reimbursement "if a parent's own actions frustrated the school's efforts."  Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys., 349 F.3d 1309, 1312 & n.2 (11th Cir. 2003) ("Parental involvement . . . . is a goal of the IDEA, and courts should be reluctant to award monies to parents who refuse or hinder the development of a FAPE or IEP.").  Thus, the court concludes that plaintiff's parents are not entitled to reimbursement for private school

tuition, nor are they entitled to any other reimbursement they are seeking.

C.    Attorney's Fees

Plaintiff contends that he is entitled to attorney's fees. The IDEA provides that "the court, in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415. "Under the IDEA, a prevailing party is one that attains a remedy that both (1) alters the legal relationship between the school district and the handicapped child and (2) fosters the purposes of the IDEA." El Paso Indep. Sch. Dist. v. Richard R., 591 F.3d 417, 421-22 (5th Cir. 2009). A party need not obtain a favorable outcome on every issue to become a prevailing party, but he or she must prevail on some "significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Alief Indep. Sch. Dist. v. C.C. ex rel. Kenneth C., 713 F.3d 268, 270 (5th Cir. 2013). Because plaintiff has not prevailed on any of his claims, he is not a prevailing party and his parents are not entitled to attorney's fees.

VII.

Order

Therefore,

The court ORDERS that plaintiff's motion for judgment on the administrative record be, and is hereby, denied, and that the findings, decisions, and rulings of the SEHO be, and are hereby, affirmed, and that all relief sought by the complaint by which this action was instituted be, and is hereby, denied.

SIGNED July 31, 2013.

_____
JOHN McBRYDE
United States District Judge

44